No. 23-1389

# In the United States Court of Appeals
# For the First Circuit

SHAWN MCBREAIRTY,

*Plaintiff-Appellant*

v.

HEATH MILLER,
in his personal and official capacities;
SCHOOL BOARD OF RSU22,

*Defendants-Appellees*

On Appeal from the United States District
Court for the District of Maine
The Hon. Nancy Torresen, District Judge
(Dist. Ct. No. 1:23-cv-00143)

BRIEF OF AMICUS CURIAE INSTITUTE FOR FREE SPEECH
IN SUPPORT OF APPELLANT AND REVERSAL

Brett R. Nolan* (Bar No. 1208861)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-3300
bnolan@ifs.org
*admitted in Kentucky; practice
supervised by DC Bar members,
D.C. App. R. 49(c)(8)*

August 4, 2023          Counsel for Amicus Curiae

DISCLOSURE STATEMENT

Counsel for amicus curiae Institute for Free Speech, Brett R. Nolan, certifies that IFS is a nonprofit corporation, has no parent company, subsidiary, or affiliate, and that no publicly held company owns more than 10 percent of its stock.

/s/ Brett R. Nolan

TABLE OF CONTENTS

Disclosure Statement ...................................................................... i

Table of Contents............................................................................ ii

Table of Authorities ...................................................................... iii

Interests of Amicus Curiae ............................................................ 1

Introduction and Summary of Argument...................................... 2

Argument ........................................................................................ 3

   I.    The school board's ban on mentioning personnel violates the First Amendment by manipulating public debate about school administration and policy. ............................................................ 3

    A.   The district court's binary theory of viewpoint discrimination is contrary to the First Amendment. ............................................ 5

    B.   A rule prohibiting "complaints or allegations" against school personnel discriminates based on viewpoint. ............................ 10

    C.   An overbroad rule against discussing personnel undermines the purpose of the public-comment period. ................................ 13

   II.   The First Amendment prohibits the government from using its property to create an artificial public debate. ............................. 17

Conclusion.................................................................................... 20

Certificate of Compliance ....................................................... 21

Certificate of Service ................................................................. 22

TABLE OF AUTHORITIES

## Cases

*Am. Freedom Def. Initiative v. King Cnty.*,
  904 F.3d 1126 (9th Cir. 2018) ................................................................ 13

*Bach v. Sch. Bd. of Va. Beach*,
  139 F. Supp. 2d 738 (E.D. Va. 2001) .................................................... 18

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) ................................................................ 4, 5, 11, 12

*Int'l Soc'y for Krishna Consciousness v. Lee*,
  505 U.S. 672 (1992) .............................................................................. 14

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*,
  3 F.4th 887 (6th Cir. 2021) .................................................................. 13

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993) ......................................................................... 3, 15

*Mama Bears of Forsyth Cnty. v. McCall*,
  Civ. A. No. 2:22-CV-142, 2022 U.S. Dist. LEXIS 234538 (N.D.
  Ga. Nov. 16, 2022) .............................................................................. 16

*Marshall v. Amuso*,
  571 F. Supp. 3d 412 (E.D. Pa. 2021) .................................................... 15

*Matal v. Tam*,
  582 U.S. 218 (2017) ........................................................ 6, 8, 11, 12, 13

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) ........................................................ 13, 14, 15, 16

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ......................................................................... 2, 15, 18

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983) .............................................................................. 14

*Ridley v. Massachusetts Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004) ................................................................ 11

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) .......................................... 2, 3, 4, 5, 6, 7, 9, 10, 12, 18

*Shurtleff v. City of Boston*,
  142 S. Ct. 1583 (2022).............................................................3

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994)......................................................17, 18

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018)..................................................13

*Wilbur v. Mahan*,
  3 F.3d 214 (7th Cir. 1993)...................................................15

## Statutes

20-A M.R.S. § 1001(1-A) ..........................................................14

20-A M.R.S. § 1001(20).......................................................4, 14

## Other Authorities

Chris Cillizza, *People hate Congress. But most incumbents get re-
  elected. What gives?*, Washington Post (May 9, 2013), available
  at https://perma.cc/CGN6-E256 ............................................8

Geoffrey R. Stone, *Content Regulation and the First Amendment*,
  25 Wm. & Mary L. Rev. 189 (1983)......................................19

INTERESTS OF AMICUS CURIAE[1]

The Institute for Free Speech is a nonpartisan, nonprofit organization dedicated to the protection of the First Amendment rights of speech, assembly, petition, and press. Along with scholarly and educational work, the Institute represents individuals and civil society organizations in litigation securing their First Amendment liberties. Challenging unreasonable and discriminatory burdens on public advocacy is a core aspect of the Institute's organizational mission in fostering free speech.

This case matters to the Institute because it implicates the government's ability to distort the marketplace of ideas to shield itself from criticism while maintaining a veneer of public debate. This is a constitutional problem of great magnitude that concerns the Institute because it diminishes political accountability and dissuades citizens from exercising their right to free speech.

---

[1] No counsel for a party authored this brief in whole or in part, nor did any person or entity, other than amicus curiae or its counsel, financially contribute to preparing or submitting this brief. All parties have consented to the Institute filing this amicus brief.

Introduction and Summary of Argument

This case pits the First Amendment against government rules that manipulate public debate about important social and political issues. For a country with "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," that fight should be easy. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The First Amendment prevails even when a speaker's advocacy includes "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.*

Yet the district court decided otherwise. Because the speech here takes place in a limited public forum, the court upheld otherwise unfathomable restrictions on public debate. That decision was wrong. Even in a limited public forum, a government's restrictions on speech must be reasonable and viewpoint neutral. These rules prevent the government from "skew[ing]" public debate by limiting the ideas and messages that speakers can share. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831–32 (1995).

That principle runs through the heart of this case and leads to only one conclusion: RSU22 cannot open a forum for discussing opinions and

problems related to the school district while excluding anyone whose opinion or problem centers on the school officials responsible for implementing education policy. Doing so discriminates against particular views, and it undermines the very purpose of the forum. The personnel rule challenged here is unconstitutional, and this Court should reverse the decision below.

ARGUMENT

I. THE SCHOOL BOARD'S BAN ON MENTIONING PERSONNEL VIOLATES THE FIRST AMENDMENT BY MANIPULATING PUBLIC DEBATE ABOUT SCHOOL ADMINISTRATION AND POLICY.

The Constitution does not transform all government property into a forum for free speech. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390–91 (1993). The government is free to keep its private property private. *Id.* And it is free to use its own resources to share its own view about issues the government cares about. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022).

But the rules change when the government opens its property for others to speak. *Rosenberger*, 515 U.S. at 829. Once it has done so, the government "must respect the lawful boundaries it has itself set." *Id.* To this end, the government "may not exclude speech where its distinction

3

is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Id.* (cleaned up).

The district court below held that Rule 2 is a reasonable and viewpoint-neutral restriction because it prohibits speakers from discussing "*all* matters relating to school personnel, regardless of whether they are complimentary or critical of the RSU 22 employee in question." ADD012. There's good reason to doubt that interpretation, as it renders most of the rule's text superfluous. *See* Appellant's Br. at 19–23; *see also Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). After all, Rule 2 prohibits "complaints" and "allegations" against employees. AA02. But it says nothing about "compliments" or other laudatory remarks. *Id.* And not even the school board argued for the atextual interpretation that the district court adopted. AA047–49.

Yet Rule 2 violates the First Amendment even if one adopts the district court's creative revision. Prohibiting speakers from mentioning school personnel in a forum otherwise devoted to discussing "school and education matters," 20-A M.R.S. § 1001(20), discriminates based on viewpoint by silencing those who believe the school's problems trace

4

back to personnel. And doing so undermines the forum's purpose. "[T]he debate is skewed in multiple ways." *Rosenberger*, 515 U.S. at 832.

A.   *The district court's binary theory of viewpoint discrimination is contrary to the First Amendment.*

The district court interpreted Rule 2 expansively to save it from its otherwise obvious viewpoint discrimination. *See* ADD012. But doing so only shifted the problem. "The government may not discriminate against speech based on the ideas or opinions it conveys." *Brunetti*, 139 S. Ct. at 2299. Banning speakers from mentioning school personnel does precisely that. It prohibits people from voicing their opinion that specific government officials bear the blame for failing schools or other problems in the district.

The district court reached a different conclusion based largely on a narrow theory of viewpoint discrimination that is incompatible with Supreme Court precedent. ADD013. The court held that Rule 2 is viewpoint neutral because speakers "can still express their pleasure or displeasure with what is happening at the public schools" so long as they don't name individual officials, *id.*, and Rule 2 "cover[s] both critical and complimentary comments," ADD014. This conclusion

5

"reflects an insupportable assumption that all debate is bipolar."
*Rosenberger*, 515 U.S. at 831.

That assumption contravenes the Supreme Cout's decades old
"understanding of the complex and multifaceted nature of public
discourse." *Id.* Debate on public issues does not always—or even often—
boil down to whether one is for or against a particular proposal. And
because of that, "[t]he First Amendment's viewpoint neutrality principle
protects more than the right to identify with a particular side." *Matal v.
Tam*, 582 U.S. 218, 249 (2017) (op. of Kennedy, J.). "It protects the right
to create and present arguments for particular positions *in particular
ways*, as the speaker chooses." *Id.* (emphasis added).

*Rosenberger* makes this point clear. In *Rosenberger*, the Supreme
Court considered a university rule providing reimbursement to student
groups for printing costs that excluded publications "with religious
editorial viewpoints." 515 U.S. at 831. The university defended its rule
as viewpoint neutral because it prohibited religious speech no matter
the perspective of the speaker. *Id.* at 830. That argument looked much
like the district court's analysis below. The university submitted that

6

its rule was viewpoint neutral because it prohibited *all* religious speech—pro or con, theistic or agnostic. *Id.* at 831.

The Supreme Court held otherwise. In doing so, the Court rejected the notion that a law is viewpoint neutral when it restricts an entire class of viewpoints (*i.e.*, all religious views), rather than just one side of the debate. "It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint." *Id.* The argument "that debate is not skewed so long as multiple voices are silenced is simply wrong: the debate is skewed in multiple ways." *Id.*

The problem in *Rosenberger* rears its head again here. The district court held that Rule 2 is viewpoint-neutral because speakers "can still express their pleasure or displeasure with what is happening at the public schools" so long as they do not "call out a named teacher either for praise or criticism." ADD013. But like *Rosenberger*, the rule excludes an entire class of viewpoints. Those who believe that specific individuals are responsible for the failures or successes of the school district cannot voice that perspective. And the district court's "close enough" standard—allowing the government to decide whether a speaker can

7

convey the gist of his or her message—only exacerbates the problem by diluting the speaker's message.

The Free Speech Clause "protects the right to create and present arguments for particular positions *in particular ways*, as the speaker chooses." *Tam*, 582 U.S. at 249 (op. of Kennedy, J.) (emphasis added). Put more simply: words matter. Criticizing school officials by name conveys a unique message that a vague reference to teachers or administrators or the school district does not capture. That's perhaps why, it is often said, that people hate Congress but love their own representatives. *See* Chris Cillizza, *People hate Congress. But most incumbents get re-elected. What gives?*, Washington Post (May 9, 2013), available at https://perma.cc/CGN6-E256. Speech about individual government officials sends a different message than speech about an institution. And by censoring the use of names, directing all praise or criticism to the institutions rather than the people responsible, government officials blunt the message in a way that protects themselves.

A practical example of how Rule 2 applies helps illustrate the problem. Under the district court's broad reading of Rule 2, a speaker

may voice the opinion that a school is underperforming because the curriculum is wrong, because teachers are underpaid, or because the class sizes are too large. But a speaker is forbidden from voicing the opinion that a school is underperforming because the school officials— the superintendent, the principal, or the teachers—responsible for executing school policy are failing.

A comment criticizing school curriculum is fine. A comment criticizing personnel for choosing that curriculum is not. That is quintessential viewpoint discrimination. It targets a single perspective about the cause of school problems for disfavored treatment, prohibiting speakers from expressing that view.

Nor does it matter if Rule 2 prohibits both compliments and criticism. This, too, relies on the mistaken belief that viewpoints are bipolar. *See Rosenberger*, 515 U.S. at 831. A speaker's belief that the school system is well run is a different viewpoint than a speaker's belief that the superintendent is doing an excellent job running the school. Likewise, criticizing "what is being taught" in schools, ADD013, is a different viewpoint than criticizing the officials responsible for doing so. That Rule 2 prohibits both positive and negative speech related to the

9

schools does not eliminate its viewpoint-based line drawing. *Id.* ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one."). If anything, it makes matters worse.

The district court tried to save Rule 2 by misreading its text so that it broadly prevents speakers from mentioning school officials for any reason—good or bad. But it did so based on a misguided understanding of viewpoint discrimination that's contrary to three decades of Supreme Court precedent. Prohibiting speakers from praising or criticizing school personnel in a forum devoted to discussing opinions and problems about the school district constitutes impermissible viewpoint discrimination.

> B.    *A rule prohibiting "complaints or allegations" against school personnel discriminates based on viewpoint.*

As an alternative holding, the district court decided that Rule 2 "is likely still constitutional" even if the court—rather than rewrite it—interpreted the rule "more narrowly" as a "restriction against raising 'complaints or allegations' about school staff." ADD017 n.14. It reached this conclusion based on an old decision from this Court that has since been abrogated by the Supreme Court's more recent decisions. *Id.* (citing *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 91 (1st

Cir. 2004). If the Court rejects the district court's broad reading of Rule 2, the Court should make clear that *Ridley* is no longer good law.

In *Ridley*, the Court upheld the constitutionality of a regulation governing advertisements on public transportation that "prohibit[ed] the use of advertisements that 'demean or disparage an individual or group of individuals.'" 390 F.3d at 91. The Court held that this regulation was viewpoint neutral because "[a]ll advertisers on all sides of all questions are allowed to positively promote their own perspective and even to criticize other positions so long as they do not use demeaning speech in their attacks." *Id.* The district court relied on this holding to conclude that Rule 2's prohibition on "complaints or allegations" against named school officials does not violate the First Amendment because it applies equally to all speakers no matter who they want to criticize or why. ADD017 n.14.

But *Ridley* does not survive the Supreme Court's decisions in *Tam* and *Brunetti*. In *Tam*, the Supreme Court unanimously agreed that a law prohibiting disparaging speech—the same kind of speech at issue in *Ridley*—constitutes viewpoint discrimination. 582 U.S. at 223 (op. of Alito, J.); *id.* at 248–49. And in *Brunetti*, the Court affirmed that

11

conclusion and extended it to similar categories of speech. 139 S. Ct. at 2299. Thus, *Ridley* is no longer good law.

Still, the district court offered two grounds for distinguishing Rule 2 from *Tam* and *Brunetti*. Neither holds up.

First, the court reasoned that "the offensive ideas themselves are not banned [by Rule 2], only the connecting of those complaints to 'any person employed by the school system.'" ADD017–18. But Rule 2 *does* ban certain ideas—criticism of school officials. It makes no difference that other forms of criticism are allowed. *See Rosenberger*, 515 U.S. at 831.

Second, the district court distinguished this case because it involves a limited public forum, while *Tam* and *Brunetti* "involved trademark regulations." ADD018. But so what? *Tam* and *Brunetti* explained what viewpoint discrimination means, and here, everyone agrees that viewpoint discrimination is prohibited in a limited public forum. The First Amendment does not define viewpoint discrimination in one way for a limited public forum, but a different way for a university speech code or trademark law. That is why both opinions in *Tam* cite limited-public-forum cases to explain viewpoint discrimination. *See* 582 U.S. at

12

243 (op of Alito, J.); *id.* at 248 (op. of Kennedy, J.). And it is why other courts have already applied *Tam* and *Brunetti* to cases like this. *See Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893–95 (6th Cir. 2021); *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1131 (9th Cir. 2018); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018).

Whether read broadly as the district court did or narrowly with the text, Rule 2 discriminates based on viewpoint. The Court should invalidate it either way.

C.     *An overbroad rule against discussing personnel undermines the purpose of the public-comment period.*

The Government "must draw a reasonable line" when regulating the content of speech at a limited public forum. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018). Although "forgiving," this is not a toothless standard. *Id.* The Government bears the burden of "articulat[ing] some sensible basis for distinguishing what may come in from what must stay out." *Id.* And its rules must further—rather than undermine—the purpose of the forum. *Id.* at 1891. Thus, categorical bans on certain kinds of speech violate the First Amendment unless the government can explain "why such a restriction 'preserves the property' for the . . . uses

13

to which it has been put." *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 692 (1992) (O'Connor, J., concurring) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 50–51 (1983)).

RSU22's ostensible ban on mentioning school personnel "fail[s] even this forgiving test." *Mansky*, 138 S. Ct. at 1888. The rule reaches far broader than whatever legitimate interest the government may have for enacting it. And it imposes an "expansive" ban on an entire class of political speech that undermines the purpose of the forum. *Id.*

Start first with that last part. Whether a rule restricting speech is "reasonable" under the First Amendment turns on the purpose of the limited public forum. Here, that purpose is for people "to voice opinions and problems," AA011, about "school and education matters," 20-A M.R.S. § 1001(20). So the question is whether a ban on mentioning school personnel is reasonable in a forum dedicated to discussing "school and education matters."

It is not. Schools are run by people. Those people implement education policy daily—the same public policy that RSU22 is statutorily charged with adopting. *See* 20-A M.R.S. § 1001(1-A). Criticizing or complimenting the government officials who run the schools and

execute education policy fits within the scope of RSU22's public-comment period. As one court has explained, "[a]n opinion that a school employee is incompetent in performing school duties or violating the law governing the performance of the employee's duties is in fact relevant to the purpose of the limited public forum." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021). Thus, Rule 2 "undermine[s]" RSU22's "interest in maintaining" a forum to hear opinions about school and education matters, *Mansky*, 138 S. Ct. at 1891, because it prevents speakers from discussing issues that otherwise fit within the "subject matter" that RSU22 seeks input on, *see Lamb's Chapel*, 508 U.S. at 393.

Making matters worse, Rule 2 prohibits core First Amendment speech. "The right to criticize public officials is at the heart of the First Amendment's right of free speech[.]" *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993). That is why the Constitution protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times*, 376 U.S. at 270. So it "is a serious matter when the whole point of [Rule 2] is to prohibit the expression of political views" about the officials responsible for enacting government policy. *See Mansky*, 138 S. Ct. at 1891.

15

Nor can RSU22 "articulate some sensible basis" for banning all mention of school personnel no matter the context. *Id.* at 1888. The board offered up a handful of justifications below—preventing harassment and defamation of employees, protecting their confidential information, and maintaining orderly meetings. AA046. "Laudable as these explanations and rationale are," it's not hard to "envision scenarios in which members of the public may have legitimate reasons" to criticize school officials "personally or directly." *See Mama Bears of Forsyth Cnty. v. McCall*, Civ. A. No. 2:22-CV-142, 2022 U.S. Dist. LEXIS 234538, at *23 (N.D. Ga. Nov. 16, 2022).

And there are ample ways to prevent the narrow problems that RSU22 might worry about. *See id.* ("For example, the prohibitions on 'physically threatening remarks' and disruptive conduct could be invoked to limit certain speech directed towards Board members that may have, for lack of a better phrase, crossed the line, and terminate speech or conduct that inhibits the meeting's progress."). The government can prohibit actual, actionable harassment of school officials, and it can protect confidential information about employees from disclosure. But a blanket ban on mentioning school officials no

matter the reason or context is so far removed from these problems that they cannot justify excluding a large swath of speech that is directly relevant to the purpose of the forum.[2]

II.   THE FIRST AMENDMENT PROHIBITS THE GOVERNMENT FROM USING ITS PROPERTY TO CREATE AN ARTIFICIAL PUBLIC DEBATE.

Rule 2 implicates deeper problems beyond a mechanical application of the black-letter rules governing a limited public forum. Those rules serve an important First Amendment interest in preventing the government from creating artificial debate on issues of public importance. This case shows why.

The Free Speech Clause prevents the government from wielding its power to "manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). This "constitutional safeguard, [the Supreme Court] has said, was fashioned to assure unfettered interchange of ideas for the bringing about of

---

[2] The district court's decision to rewrite Rule 2 only compounds the problem. RSU22 did not defend a rule prohibiting speakers from merely mentioning a school official by name. Rather, it defended the text that the plaintiff challenged—Rule 2's prohibition on making "allegations" and "complaints" against school officials. *See* AA046–47. RSU22's narrow justification for a narrower rule does not support the categorical ban the district court upheld.

political and social changes desired by the people." *New York Times*, 376 U.S. at 269. It is "the theory of our Constitution" that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). And if the First Amendment does anything, it prevents the government from interfering in public debate to "effectively drive certain ideas or viewpoints from the marketplace" of ideas. *Turner Broad.*, 512 U.S. 641.

The worry about manipulating public debate animates the rules governing a limited public forum. "The Supreme Court has long . . . warned about the pernicious effects of an artificially controlled public debate and [has] held that the First Amendment serves to prevent such manipulation." *Bach v. Sch. Bd. of Va. Beach*, 139 F. Supp. 2d 738, 742 (E.D. Va. 2001). That danger looms whenever the government regulates the content of speech, and it is no less worrisome that the government manipulates debate on its own property. *See, e.g.*, *Rosenberger*, 515 U.S. at 831–32 (adopting a broad interpretation of viewpoint discrimination to prevent a university from "skew[ing]" public debate in a limited public forum).

18

The government, of course, can choose not to open a limited forum at all. But it cannot open a forum that skews "the marketplace of ideas." *See id.* at 831. That's because "the first amendment is concerned, not only with the extent to which a law reduces the total quantity of communication, but also -- and perhaps even more fundamentally -- with the extent to which the law distorts public debate." Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 Wm. & Mary L. Rev. 189, 198 (1983).

All this explains why the First Amendment cabins the government's power over speech even in a limited public forum—and why Rule 2 is unconstitutional. Content-based restrictions must be viewpoint-neutral—if the government asks for input on a particular topic, it cannot prevent people from sharing their own unique message about the issue. And content-based restrictions must be reasonable—if the government opens a forum for discussion, it cannot undermine that discussion by excluding otherwise relevant speech. Both rules serve the same goal: Preventing the government from manipulating debate by setting up an ostensibly free and fair discussion that turns out to be neither.

That's the problem here. As discussed above, Rule 2 violates both restrictions on regulating speech at a limited public forum. But in doing so, it exemplifies why those rules exist: A forum to discuss education policy in which speakers cannot express the view that certain government officials bear responsibility for the school district's failures (or successes) is exactly the kind of artificial public debate the First Amendment forbids. Those tuning in to hear opinions about the school district will wrongly conclude that the public has little to say about the individuals in charge. And so government officials at RSU22 can create the veneer of a robust debate while avoiding the criticism and accountability the First Amendment protects.

## CONCLUSION

The Court should reverse the district court's judgment.

August 4, 2023          Respectfully submitted by,

/s/ Brett R. Nolan
Brett R. Nolan* (Bar No. 1208861)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-3300
bnolan@ifs.org
*admitted in Kentucky; practice supervised
by DC Bar members, D.C. App. R. 49(c)(8)

Counsel for Amicus Curiae

20

CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) because it contains 3,875 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced Serif typeface, Century Schoolbook, in 14-point font using Microsoft Word.

/s/ Brett R. Nolan

CERTIFICATE OF SERVICE

I certify that on August 4, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Brett R. Nolan