**CASE NO. 23-1389**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

SHAWN MCBREAIRTY,

    *Plaintiff-Appellant*,

v.

HEATH MILLER, IN HIS PERSONAL AND OFFICIAL CAPACITIES; SCHOOL BOARD OF RSU22,

    *Defendants-Appellees.*

———————————

Appeal from the United States District Court for the District of Maine
District Court Case No.: 1:23-cv-00143

———————————

**BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT**

———————————

| | |
|---|---|
| Anastasia P. Boden | J. Michael Connolly |
| Laura A. Bondank |   *Counsel of Record* |
| CATO INSTITUTE | CONSOVOY MCCARTHY PLLC |
| 1000 Mass. Ave., N.W. | 1600 Wilson Blvd., Ste. 700 |
| Washington, DC 20001 | Arlington, VA 22209 |
| (202) 789-5242 | (703) 243-9423 |
| aboden@cato.org | mike@consovoymccarthy.com |
| | |
| August 2, 2023 | *Counsel for Amicus Curiae* |

## CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit public policy research foundation operating under § 501(c)(3) of the Internal Revenue Code. The Cato Institute is not a subsidiary or affiliate of a publicly owned corporation, and it does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus's* participation.

Dated: August 2, 2023                              /s/ *J. Michael Connolly*

## TABLE OF CONTENTS

Page(s)

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ............................................................................. iii

INTEREST OF *AMICUS CURIAE* .....................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................2

ARGUMENT .......................................................................................................4

I.    THE PUBLIC PARTICIPATION POLICY IS UNCONSTITUTIONAL VIEWPOINT DISCRIMINATION.......................4

    A.    Good Government Both Encourages And Requires More Speech, Not Less. ........................................................................4

    B.    School Board Meetings are a Particularly Important Venue for Critiquing School Officials..................................................8

    C.    The School Board's Policy is Viewpoint Discriminatory. ...................9

CONCLUSION ...................................................................................................12

CERTIFICATE OF COMPLIANCE ...................................................................13

CERTIFICATE OF SERVICE.............................................................................14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*City Council of Los Angeles v. Taxpayers for Vincent*,
　466 U.S. 789 (1984) .................................................................................... 7

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
　473 U.S. 788 (1985) ................................................................................ 5, 6

*Davison v. Randall*,
　912 F.3d 666 (4th Cir. 2019) ..................................................................... 10

*Garrison v. Louisiana*,
　379 U.S. 64 (1964) .................................................................................... 12

*Hague v. Comm. for Indus. Org.*,
　307 U.S. 496 (1939) .................................................................................... 4

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
　508 U.S. 384 (1993) .................................................................................... 7

*Marshall v. Amuso*,
　571 F. Supp. 3d 412 (E.D. Pa. 2021) ........................................................ 10

*Matal v. Tam*,
　582 U.S. 218 (2017) ........................................................................ 7, 8, 11

*McBreairty v. Miller*,
　No. 1:23-cv-00143-NT, 2023 Dist. LEXIS 72379 (D. Me. Apr. 26, 2023) ........... 8

*Meyer v. Grant*,
　486 U.S. 414 (1988) .................................................................................. 12

*New York Times Co. v. Sullivan*,
　376 U.S. 254 (1964) ................................................................................ 3, 5

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
　460 U.S. 37 (1983) .................................................................................. 5, 6

*Reed v. Town of Gilbert*,
　576 U.S. 155 (2015) .................................................................................... 7

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................................6, 10

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966) ............................................................................................10

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................................................7

*Whitney v. California*,
    274 U.S. 357 (1927) .........................................................................................3, 5

## Other Authorities

*About School Board and Local Governance*, NSBA ............................................8, 9

John D. Inazu, *The First Amendment's Public Forum*, 56 WM. & MARY L. REV. 1159 (2015) ..................................................................................................7

Jonathan Glancey, *The Violent History of Public Squares*, BBC (Dec. 2, 2014) .................................................................................................................4

Kate E. Andrias, *A Robust Public Debate: Realizing Free Speech in Workplace Representation Elections*, 112 YALE L.J. 2415 (2003) ........................5

RSU 22 POLICIES, KE – PUBLIC CONCERNS AND COMPLAINTS ...............................11

Susan Garrison, *Public School as Public Forum*, 54 TEX. L. REV. 90 (1975) ..........5

Terri Huggins Hart, *5 Very Good Reasons to Attend a School Board Meeting*, PARENTS (Feb. 9, 2023) ......................................................................9

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and issues the annual *Cato Supreme Court Review*. This case interests Cato because it concerns foundational First Amendment principles and the right to critique public officials or policy.

---

[1] No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Our culture celebrates dissent. A quick Google search reveals dissent pins, coffee mugs, stickers, socks, and earrings—most of them adorned with drawings of Justice Ruth Bader Ginsburg, who was known for her pointed dissenting opinions. But dissent is not just a custom, it's a treasured constitutional right. In fact, the right to criticize public officials and policy is so axiomatic that it's difficult to imagine a law censoring critique. And yet in early 2023, local school board members called the police on the Appellant based on the mere fact of his having criticized a public employee by name.

Shawn McBreairty resides in Hampden, Maine, a town within Regional School Unit 22. As a member of the Unit 22 community, McBreairty is a frequent and indeed notorious participant at school board meetings. But when McBreairty attempted to critique particular school employees, public broadcast of the meeting was cut, the Board took a recess, and board members called the police to remove him.

The Board defends its conduct based on its so-called public participation policy, which bans public complaints about school district staff at school board meetings. McBreairty sought a temporary restraining order and preliminary injunction against that policy so that he could fully exercise his First Amendment rights at upcoming school board meetings. In denying the injunction, the district

court ruled that the policy was a valid viewpoint-neutral restriction on speech, since it prohibited not just complaints about public employees, but all "personnel matters."

The district court erred by minimizing the liberty-protecting function of public debate with government officials and ignoring how the challenged policy stifles that debate by targeting viewpoints that are critical of government. For as long as public spaces have existed, people have gathered to discuss matters of political and social importance, including the actions of specific government officials. The Framers believed that free expression is "indispensable to the discovery and spread of political truth." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). The First Amendment therefore reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," and that it "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). In short, the Constitution requires public officials to have thick skin.

Unit 22's public participation policy discourages community members from discussing matters of fundamental importance to school administration—indeed, it was self-evidently *designed* to achieve that forbidden goal. By prohibiting discussion of school district employees, the school board makes it impossible to

effectively critique government policy and undermines school board meetings as a key institution of small-town democratic decision making.

## ARGUMENT

**I. THE PUBLIC PARTICIPATION POLICY IS UNCONSTITUTIONAL VIEWPOINT DISCRIMINATION.**

    **A. Good Government Both Encourages And Requires More Speech, Not Less.**

For as long as public spaces have existed, they have been a point of convergence for public debate. From the agora of ancient Greece to the modern-day school board meeting, public property has always been a place of free expression and representative government. Throughout the world's history, public spaces are "where tradespeople and philosophers, poets and politicians rubbed shoulders and where, too, the public complained and demonstrated." Jonathan Glancey, *The Violent History of Public Squares*, BBC (Dec. 2, 2014).[2]

That is perhaps nowhere more true than here in America. The right to free expression in public places has been "a part of the privileges, immunities, rights, and liberties of [American] citizens" since our nation's founding. *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). The Framers believed that "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," and "that without free speech and assembly discussion

---

[2] Available at https://bbc.in/3DA0fLf.

would be futile." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). Thus, in drafting the First Amendment, the Framers sought to "create the 'uninhibited, robust and wide-open' public debate necessary for the exercise of self-governance." Kate E. Andrias, *A Robust Public Debate: Realizing Free Speech in Workplace Representation Elections*, 112 YALE L.J. 2415, 2415 (2003) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

"Access to government property can be crucially important to those who wish to exercise their First Amendment rights." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 815 (1985) (Blackmun, J., dissenting). The government has "a monopoly on open spaces that are both suitable for large outdoor meetings and available without cost." Susan Garrison, *Public School as Public Forum*, 54 TEX. L. REV. 90, 93 (1975). And it is not unusual for certain government forums—like school board meetings—to be the most suitable places for effective government critique to occur. Without limits on the government's ability to restrict speech in public spaces, the government could eliminate speech critical of its conduct in the very place where it would be most effective—perhaps not coincidentally.

The government's ability to restrict speech in public forums depends on "the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). "In places which by long tradition or government fiat have been devoted to assembly and debate, the rights of the State to limit expressive

activity are sharply circumscribed." *Id.* In these traditional public forums, the government may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication," but may not enforce content-based restrictions unless it can show "that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.*

Alternatively, "[p]ublic property which is not by tradition or designation a forum for public communication is governed by different standards." *Id.* at 46. Unlike traditional public forums, limited public forums consist of "public property that traditionally has not been available for assembly and debate." *Cornelius*, 473 U.S at 813 (Blackmun, J., dissenting). There, the government may confine the forum "to the limited and legitimate purposes for which it was created." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Once it has opened a limited forum, however, "the State must respect the lawful boundaries it has itself set." *Id.* Accordingly, in addition to time, place, and manner restrictions, the government may enforce content-based restrictions on speech, but only insofar as those restrictions "preserve[] the purposes of that limited forum." *Id.* at 830.

Although reasonable content-based restrictions may be permissible in a limited public forum, under no circumstances is the government permitted "to

regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). "To prohibit an expression of an idea simply because society finds the idea itself offensive or disagreeable" is to prohibit the unfettered exchange of ideas so crucial to free thought, good government, and the preservation of liberty. *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The desire to shield the public from unsavory or offensive topics is not sufficient reason for silencing ideas that may influence the greater public debate. *Matal v. Tam*, 582 U.S. 218, 243 (2017) (finding the government unconstitutionally restricted speech based on viewpoint because "giving offense is a viewpoint"). Even bad ideas or sharp words deserve to be heard; the remedy to disagreeable ideas is more speech, not censorship. When the government suppresses speech based on viewpoint, it "interfer[es] with… an individual's ability to express thoughts and ideas that can help that individual determine the kind of society in which he wishes to live, help shape that society, and help define his place within it." *Reed v. Town of Gilbert*, 576 U.S. 155, 176–77 (2015) (Alito, J., concurring).

The public forum "signifies a willingness to tolerate dissent, discomfort and even instability." John D. Inazu, *The First Amendment's Public Forum*, 56 WM. & MARY L. REV. 1159, 1165 (2015). And "[t]he First Amendment[] . . . protects the

right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Tam,* 582 U.S. at 249 (Kennedy, J., concurring). The School Board's policy is directly contrary to these principles.

### B. School Board Meetings are a Particularly Important Venue for Critiquing School Officials

Here, the Board removed McBreairty from a public school board meeting based on its public participation policy, which stated:

> Confidential personnel information will not be shared in a public session. No complaints or allegations will be allowed at Board meetings concerning any person employed by the school system or against particular students. Personnel matters or complaints concerning student or staff issues will not be considered in a public meeting but will be referred through established policies and procedures.

*McBreairty v. Miller*, No. 1:23-cv-00143-NT, 2023 Dist. LEXIS 72379, at *3 (D. Me. Apr. 26, 2023). In other words, any specific grievances or negative observations cannot be aired in public, and instead must be filed as official complaints—out of public sight.

School board members are "elected by people in their community to represent their values, views, and desires for the public schools in their district." *About School Board and Local Governance*, NSBA.[3] "The school board represents the community's voice in public education, providing citizen governance and knowledge of the community's resources and needs, and board members are the

---

[3] Available at https://bit.ly/473FTYv.

policy-makers closest to the student." *Id.* It is thus perhaps most vital that complaints regarding teacher or other school district employee conduct be aired at school board meetings, where important school debates occur and policies are decided.

In fact, attending and participating in school board meetings is one of the few ways community members can engage in public-school policymaking. "By attending board meetings, community members put themselves in the position to ask board members the tough questions on behalf of the community." Terri Huggins Hart, *5 Very Good Reasons to Attend a School Board Meeting*, PARENTS (Feb. 9, 2023).[4] And, if the community does not feel that the school board is properly representing their interests, they can hold them accountable by electing new board members. NSBA, *supra*.

### C.  The School Board's Policy is Viewpoint Discriminatory.

Whatever the merits or demerits of McBreairty's concerns about teacher conduct in his own local school district, he has a constitutional right to express them; indeed, even the Board acknowledges that his speech is constitutionally protected as a general proposition. It claims, however, that it can restrict this speech in perhaps the most important forum it can occur. It asserts the power to do so (and the district court agreed that it could do so) because the policy is purportedly viewpoint neutral. It is not.

---

[4] Available at https://bit.ly/3OfibA1.

The district court reasoned that the School Board's policy was viewpoint neutral because it restricts discussion of "personnel matters," a purportedly neutral category, and the court considered "complaints" to be merely a sub-category within that broader designation. But the government cannot censor *certain* viewpoints by hiding that discrimination behind a broader ban on speech. Here, the Board might well be restricting other speech in addition to complaints—but it is selectively banning complaints nonetheless. And when the government restricts the ability of individuals to critique the government, it engages in quintessential viewpoint discrimination. *See, e.g.*, *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("Criticism of government is at the very center of the constitutionally protected area of free discussion."); *Rosenberger.*, 515 U.S. at 828; *Marshall v. Amuso*, 571 F. Supp. 3d 412, 422 (E.D. Pa. 2021) (government engaged in viewpoint discrimination when "those who express[ed] support for a decision by singling out a School Board member [were] welcome, but those who criticize[d] a decision [were] cut off"); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), as amended (Jan. 9, 2019) (government official's action blocking a critic on Facebook was viewpoint discrimination).

Indeed, the Board all but admitted it was specifically concerned about viewpoints critical of government behavior. It acknowledged that its policy restricts "allegations of wrongdoing, personal attacks, and criticisms of, on, or against

specifically named educators," but contended that the policy was not viewpoint discriminatory because it bans critiques of any variety. Regardless of why a person might criticize a district employee, they say, the critique is banned all the same.

But bans on criticism are not neutral merely because they discriminate against all critiques equally. Even when a law "evenhandedly prohibits disparagement of all groups" it can still be an unconstitutional restriction on speech. *See Tam*, 582 U.S. at 243. The point is not that the government is censoring particular criticisms; it's that the government is censoring critique at all.

The district court further held that publicly airing criticisms of particular government employees is unnecessary because the Board provides alternative procedures for handling complaints about teacher performance. But administrative procedures out of the public eye are not a substitute for public debate. Nothing in the complaint-process indicates that matters raised therein will be addressed publicly or otherwise brought to the attention of the community. Instead, personnel-related complaints are processed through various levels of school administrators in an attempt to reach resolution before they are ultimately referred to the Chair of the Board of Directors. RSU 22 POLICIES, KE – PUBLIC CONCERNS AND COMPLAINTS.[5] The process might, therefore, provide a means of resolving disputes, but it does not offer any opportunity for public debate.

---

[5] Available at https://bit.ly/3Ki3AT7.

11

The public-forum doctrine rests on the understanding that uninhibited public debate is necessary to facilitate "political and social changes desired by the people." *Meyer v. Grant*, 486 U.S. 414, 421 (1988). "Speech concerning public affairs" is therefore "more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Particularly at a time when public interest in education policy is at a historical zenith, individuals must be free to discuss what is happening in their schools, even—indeed, perhaps especially—if the discussions are uncongenial to their subjects.

## CONCLUSION

The district court's decision should be reversed.

Respectfully submitted,

| | |
|---|---|
| Anastasia P. Boden | J. Michael Connolly |
| Laura A. Bondank | *Counsel of Record* |
| CATO INSTITUTE | CONSOVOY MCCARTHY PLLC |
| 1000 Mass. Ave., N.W. | 1600 Wilson Blvd., Ste. 700 |
| Washington, DC 20001 | Arlington, VA 22209 |
| (202) 789-5242 | (703) 243-9423 |
| aboden@cato.org | mike@consovoymccarthy.com |
| | |
| August 2, 2023 | *Counsel for Amicus Curiae* |

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 2,513 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman typeface.

Dated: August 2, 2023                                             /s/ *J. Michael Connolly*

## CERTIFICATE OF SERVICE

I certify that on August 2, 2023, I electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the First Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated: August 2, 2023　　　　　　　　　　　　　/s/ *J. Michael Connolly*